IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-60

No. 403A20

Filed 11 June 2021

IN THE MATTER OF: I.K.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 848 S.E.2d 13 (N.C. Ct. App. 2020), affirming an order entered on 22 March 2019 by Judge Samantha Cabe in District Court, Orange County. Heard in the Supreme Court on 23 March 2021.

*Stephenson & Fleming, LLP, by Deana K. Fleming, for petitioner-appellee Orange County Department of Social Services.*

*Sean P. Vitrano for respondent-appellant father.*

BARRINGER, Justice.

¶ 1    Respondent is the biological father of I.K. (Iliana)[1] and appeals from the Court of Appeals decision affirming the trial court's permanency-planning order granting guardianship of Iliana to her maternal grandmother. Since we conclude that the trial court's findings of fact are supported by clear and convincing evidence and the findings of fact support the conclusion that respondent acted inconsistently with his constitutionally protected status as Iliana's parent, we affirm.

---

[1] A pseudonym is used to protect the juvenile's identity and for ease of reading. While the parties agreed to a different pseudonym, we use the pseudonym used by the Court of Appeals for consistency.

## I. Factual and Procedural Background

Iliana was born to respondent and Iliana's mother (Patty)[2] in 2012. On 10 November 2014, the Rockingham County Department of Social Services (RCDSS) received an initial Child Protective Services (CPS) report for Iliana and her half sibling.[3] CPS was concerned that Iliana was living in a hoarder home, that Iliana's parents were using illegal substances, that her parents were selling their food stamps, and that her parents were having domestic discord. After RCDSS completed an assessment, services were not recommended, and the case was closed on 6 January 2015.

On 16 October 2015, the Orange County Department of Social Services (OCDSS) received a CPS report alleging that Iliana's half sibling was exposed to drug abuse and domestic violence while in Patty's care. Respondent and Patty did not live together at the onset of OCDSS's involvement with Patty. On 8 January 2016, Patty was sentenced to forty-five days in jail for shoplifting and violating her probation. On 26 April 2016, Patty tested positive for cocaine and was jailed for violating her probation.

After Patty was jailed, respondent stated that he could not care for Iliana due

---

[2] A pseudonym is used for Iliana's mother for ease of reading. Furthermore, Patty is subject to the trial court's order ceasing reunification as to Iliana and appealed the trial court order to the Court of Appeals. However, Patty neither filed a notice of appeal of the Court of Appeals opinion affirming the trial court's order to this Court, nor did she file a brief regarding the instant case.

[3] Iliana's half sibling, who has the same mother, is not the subject of this appeal.

to his work schedule, and he voluntarily placed Iliana in her maternal grandmother's care. After Patty was released from jail, respondent and Patty met with OCDSS and agreed that Iliana would remain with her maternal grandmother "until the housing situation was resolved and [respondent and Patty] engaged in substance abuse treatment."

On 27 May 2016, respondent completed an intake with a substance abuse recovery center but refused to submit to drug screens and admitted to the social worker that he would test positive for marijuana. By August 2016, respondent and Patty were homeless and were staying with respondent's mother. Due to respondent's substance abuse and lack of stable housing, OCDSS obtained nonsecure custody of Iliana on 10 August 2016. Shortly thereafter, respondent and Patty agreed to the entry of a consent order that granted temporary custody of Iliana to her maternal grandmother.

After a hearing on 15 September 2016, the trial court entered an order on 6 December 2016 adjudicating Iliana to be a dependent juvenile and ordering her to remain in the temporary legal and physical custody of her maternal grandmother. The trial court ordered respondent and Patty to complete drug screens, seek substance abuse treatment, and comply with all treatment recommendations. However, respondent was arrested in October 2016 and was subsequently convicted of assault on a female after a domestic violence incident between himself and Patty.

¶ 7 The trial court held a hearing on 15 December 2016 to review the case and found that respondent was not complying with drug screens and that domestic violence was a new concern due to the domestic violence incident between respondent and Patty.

¶ 8 After the first permanency-planning hearing held on 2 March 2017, the trial court entered an order setting the permanent plan for Iliana as guardianship and a secondary plan of reunification. At the time of the hearing, respondent had refused eight out of fifteen requested drug screens and stated on one of the refusals that he would likely test positive for marijuana.

¶ 9 On 4 May 2017, respondent requested that the trial court review the case to determine whether the trial court's last order was in Iliana's best interests, including the provisions regarding visitation. The trial court granted respondent unsupervised visits for a minimum of one hour each week after a review hearing on 18 May 2017. However, the trial court stated that the visits would be suspended or revised if respondent was not in full compliance with his substance abuse treatment and did not submit negative drug screens.

¶ 10 On 15 June 2017, a second permanency-planning hearing was held. In an order entered on 17 July 2017, the trial court maintained the permanent plan of guardianship and the secondary plan of reunification for Iliana. The trial court found that respondent and Patty had refused a significant number of drug screens and had

not engaged in services to address their domestic violence issues. The trial court subsequently ordered respondent and Patty to submit to random drug screens, continue substance abuse treatment, abstain from domestic violence, and maintain safe and stable housing. Respondent was also required to participate in a program for domestic violence perpetrators.

On 4 July 2017, respondent and Patty appeared under the influence of a substance while in Iliana's presence. OCDSS rescinded unsupervised visitation on 19 July 2017. Respondent and Patty had another child together in September 2017.

On 7 November 2017, the trial court entered a permanency-planning order in which it granted guardianship of Iliana to her maternal grandmother and ceased reunification efforts with respondent due to a lack of progress on his case plan. The trial court incorporated by reference the social worker's court report, which documented that respondent continued to reside in his mother's home despite safety concerns, respondent and Patty had another child that resided in respondent's mother's home, respondent could only miss one more session before being terminated from the domestic violence perpetrator program, and both respondent and Patty last refused a drug screen on 5 June 2017. Respondent and Patty timely appealed the trial court's order granting guardianship to Iliana's maternal grandmother.

In March 2018, both respondent and Patty completed their substance abuse program at the substance abuse recovery center. However, on 20 April 2018, Patty

displayed drug-seeking behavior evidenced by text messages she sent to respondent.

On 7 August 2018, in a unanimous decision, the Court of Appeals vacated the trial court's order and remanded the case to the trial court based on its conclusion that there were insufficient findings to support the trial court's conclusion that respondent was acting inconsistently with his constitutionally protected status as a parent.

Shortly thereafter, on 23 August 2018, respondent was involved in a domestic incident with his mother. The emergency response call log indicated that respondent was verbally aggressive toward his mother and was "tearing up" respondent's mother's home. On 4 September 2018, respondent tested positive for marijuana. Also, RCDSS completed a home visit on 12 December 2018 and found that respondent's mother's home continued to pose safety concerns for Iliana.

On 3 and 18 January 2019, the trial court held another permanency-planning hearing regarding Iliana. The trial court again found that respondent had acted inconsistently with his protected status as a parent and determined that guardianship with Iliana's maternal grandmother was in Iliana's best interests.

## II.    Respondent's Appeal

Respondent timely appealed to the Court of Appeals. In a divided opinion filed on 18 August 2020, the Court of Appeals affirmed the trial court's order. *See In re I.K.*, 848 S.E.2d 13, 24 (N.C. Ct. App. 2020). Respondent then appealed to this Court.

¶ 18 On appeal, respondent argues that the trial court's conclusion that he acted inconsistently with his constitutionally protected status as a parent to Iliana is not supported by clear and convincing evidence. Respondent specifically challenges the trial court's findings of fact 26(b)−(c), 28, 30, 37, and 43(a), which relate to his substance abuse, housing situation, and involvement in domestic violence.

## III. Standard of Review

¶ 19 "[A] trial court's determination that a parent's conduct is inconsistent with his or her constitutionally protected status must be supported by clear and convincing evidence." *Adams v. Tessener*, 354 N.C. 57, 63 (2001). "The clear and convincing standard requires evidence that should fully convince. This burden is more exacting than the preponderance of the evidence standard generally applied in civil cases, but less than the beyond a reasonable doubt standard applied in criminal matters." *Scarborough v. Dillard's, Inc.*, 363 N.C. 715, 721 (2009) (cleaned up) (first quoting *In re Will of McCauley*, 356 N.C. 91, 101 (2002); then quoting *Williams v. Blue Ridge Bldg. & Loan Ass'n*, 207 N.C. 362, 363–64 (1934)), *cert. denied*, 563 U.S. 988 (2011).

¶ 20 The trial court's legal conclusion that a parent acted inconsistently with his constitutionally protected status as a parent is reviewed de novo to determine whether the findings of fact cumulatively support the conclusion and whether the conclusion is supported by clear and convincing evidence. *See Boseman v. Jarrell*, 364 N.C. 537, 549 (2010); *Adams*, 354 N.C. at 65–66. The trial court's findings of fact are

conclusive on appeal if unchallenged, *see Boseman*, 364 N.C. at 549; *Adams*, 354 N.C. at 65–66, or if supported by competent evidence in the record, *see In re L.R.L.B.*, 2021-NCSC-49, ¶ 11.

## IV. Analysis

The trial court relied on the challenged findings of fact along with others, which in pertinent part are listed below, to support its conclusion that respondent acted inconsistently with his constitutionally protected right to parent Iliana:

> 26. Both [Patty and respondent] have acted inconsistently with their constitutionally-protected right to parent the minor child. Specifically, this court finds as follows:
>
> > a. [Patty and respondent] voluntarily placed the minor child with her maternal grandmother on April 26, 2016 because of [Patty's] impending incarceration and [respondent's] lack of suitable housing and work schedule.
> >
> > b. [Patty and respondent] have not obtained safe and stable housing appropriate for the juvenile in the three (3) years the juvenile has been out of their custody. Though the home in which they were living was found to have met minimum standards by RCDSS on two visits between March 2, 2017 and October 5, 2017, the home was deemed not suitable for the minor child when RCDSS visited the home in the spring of 2018 and again on 12/12/2018.
> >
> > c. [Patty and respondent] continue to engage in domestic violence and illegal drug use despite their completion of treatment and classes.
>
> 27. When this hearing began on January 3, 2019, [Patty and respondent] were still residing with [respondent's] mother in a home that Rockingham County DSS deemed

unsuitable for the children as late as December 12, 2018.

28. [Patty and respondent] have made some limited progress to remedy conditions that led to the minor child being removed from their home. However, the issues of substance use, domestic violence, and safe, substance-free housing are still present despite numerous services that have been offered to the family since the issues were first identified in 2014.

. . . .

30. . . . [Respondent] completed a domestic violence perpetrator program at Alamance County DV Prevention in February 2018. There has not been another identified domestic violence incident between [Patty and respondent], however there has been domestic violence in the home between [respondent] and his mother . . . .

31. On August 23, 2018, law enforcement responded to a domestic disturbance involving [respondent and his mother] . . . , with whom [Patty and respondent] reside. [Patty and respondent] were not home at the time of law enforcement response. [Respondent] testified he and [his mother] had a disagreement over his misplacing her handicapped placard. He stated that he fell into the dryer while [his mother] was in the bathroom, and then he left the home.

32. [Patty and respondent] completed substance abuse treatment with Freedom House Recovery in March 2018. During the course of the case, [Patty and respondent] only partially complied with random drug screens. Upon remand of the case, OCDSS requested [Patty and respondent] each complete hair follicle drug screens on September 4, 2018. Both parents tested positive for marijuana.

. . . .

34. Despite [respondent] earning a gross income of

$46,349.00 per year in a job he has maintained for 10 years and [his mother] paying a portion of the household expenses, [Patty and respondent] continue to reside with their infant daughter and [respondent's mother] . . . , with whom they moved after eviction in 2016 in a two-bedroom single wide trailer that has holes in the floor that were recently covered with plywood at the request of RCDSS, and that has not otherwise been maintained.

35. Rockingham County DSS completed multiple home visits in 2018. The home was identified to need serious repairs, specifically to the floor, that needed to be resolved for safety; and the home continued to be extremely cluttered akin to hoarding. The home was not deemed appropriate for another juvenile to reside as recently as December 12, 2018.

36. The GAL made two visits to [Patty and respondent's] home . . . prior to appeal of the last order. He recalled the condition of the home to be similar to the description testified to by [the CPS investigator] . . . .

37. At the continuation of this hearing on January 18, 2019, [Patty and respondent] provided photographs of the home that showed somewhat improved conditions from the conditions reflected in the photographs and testimony presented on January 3, 2019. [Patty] testified that the new photos were taken after the January 3, 2019 beginning of the hearing. The court finds the testimony and documentation of Rockingham County DSS to be credible, and that the housing conditions of [Patty and respondent] as of December 12, 2018 was not safe and appropriate for [Iliana]. Any improvements made between the beginning of this hearing and its conclusion are not indicative of the day-to-day condition of the home.

38. [Patty and respondent] indicate they plan to reside with [respondent's mother] in the future despite the ongoing concerns about the safety and appropriateness of the condition of the home.[ ]

39. [Patty and respondent] represent that their finances are tight despite [respondent's] stable employment where he earns more than $46,000 per year. [Patty and respondent] have two vehicle loans that total $519 per month. . . . [Patty and respondent] do not pay rent to [respondent's mother], and they share utility expenses with her. [Respondent's mother] pays the mortgage on the home and all of the car insurance is in her name. [Respondent] pays $53 per week in child support.

. . . .

43. Pursuant to N.C.G.S. § 7B-906.2(d), the following demonstrate a lack of success:

> a. [Patty and respondent] are not making adequate progress within a reasonable period of time under the secondary plan of reunification. They have not resolved the issues of substance abuse and [u]nstable housing that led to [the] removal of custody [of Iliana].

**A. Substance Abuse**

Respondent challenges finding of fact 26(c) as unsupported by clear and convincing evidence. We first address his challenge to the portion of the finding addressing his substance abuse. We conclude the evidence clearly shows that respondent continued to engage in substance abuse after he completed the substance abuse treatment program.

In March 2018, respondent completed his court-ordered substance abuse treatment program. Yet, a month later, in April 2018, Patty exchanged text messages with respondent that displayed drug-seeking behavior. Respondent also continued to use marijuana despite his substance abuse history and tested positive for marijuana

in September 2018. Respondent concedes some of these facts expressly in his brief and also concedes them by not challenging these findings of fact by the trial court.

Furthermore, the evidence and testimony from the hearing tend to show that respondent's substance abuse issue had persisted since RCDSS became involved with Iliana in 2014. In 2014, RCDSS was concerned that respondent was abusing substances. Respondent also repeatedly refused to submit to drug screens throughout the duration of this case, refusing a total of eleven out of thirty-one requested drug screens, and of the screens he completed, he tested positive for substances on two occasions.

Respondent asks this Court to reweigh the evidence and conclude that one positive drug screen does not establish that he continued to use illegal drugs as found by the trial court. However, the trial court was also presented with evidence that Patty exchanged text messages with respondent displaying drug-seeking behavior in April 2018, that respondent tested positive for marijuana after completing his court-ordered substance abuse treatment program in September 2018, and that respondent refused eleven out of thirty-one drug screens. Furthermore, respondent's request is untenable; this Court reviews the trial court's order to determine whether competent evidence supports the finding of fact and cannot reweigh the evidence when making this determination.

> It is the trial court's responsibility to pass upon the credibility of the witnesses and the weight to be given their

> testimony and the reasonable inferences to be drawn therefrom. Because the trial court is uniquely situated to make this credibility determination appellate courts may not reweigh the underlying evidence presented at trial.

*In re G.G.M.,* 377 N.C. 29, 2021-NCSC-25, ¶ 18 (cleaned up) (first quoting *In re A.R.A.*, 373 N.C. 190, 196 (2019); then quoting *In re J.A.M.*, 372 N.C. 1, 11 (2019)). In light of the aforementioned evidence and concessions by respondent, the portion of finding of fact 26(c) that respondent "continue[s] to engage in . . . illegal drug use despite [his] completion of treatment and classes" is plainly supported by clear and convincing evidence.

**B. Safe and Stable Housing**

¶ 26    Respondent challenges findings of fact 26(b), 28, 37, and 43(a) as not supported by clear and convincing evidence.[4] However, substantial evidence was presented to the trial court to support its findings that respondent did not have safe and stable housing for Iliana.

¶ 27    At the 3 January 2019 permanency-planning hearing, the Rockingham County CPS investigator testified that when he visited respondent's mother's home for the spring 2018 visit, the clutter in the home was piled to the ceiling in some areas and there were holes in the floor of the home covered with plywood. When the investigator

---

[4] Respondent also challenges the trial court's finding that the guardian ad litem corroborated the RCDSS report of the condition of respondent's mother's home as being irrelevant. Since the finding is not necessary to our determination that the trial court's findings are supported by clear and convincing evidence, we do not consider that challenged finding in our analysis.

returned to complete another visit on 12 December 2018, he found the same conditions present. The investigator stated that respondent's mother's home would pose safety concerns to Iliana, and he was unsure of where she would be able to sleep if respondent regained custody. Specifically, the investigator stated that respondent's mother offered that Iliana could sleep on a "foldout couch," but the investigator was "not sure how that would be folded out because [of] the size of the trailer." Notably, respondent has not challenged finding of fact 35, in which the trial court found based on the investigator's testimony that the house was deemed inappropriate for Iliana "to reside as recently as December 12, 2018."

The investigator also testified that during his spring 2018 inspection, the holes in the floor of respondent's mother's home had plywood on it, but when he walked on it, he "could feel [the plywood] kind of bouncing a little bit." The investigator notified respondent of the issues with the floor during that inspection. At the 12 December 2018 inspection, when the investigator found the floor in the same condition, respondent's mother asked the investigator not to include the flooring issue in his report, but nevertheless told the investigator that her in-home aide has shared concerns that she would fall through the floor. While respondent and Patty testified to placing new plywood over the holes in the floor after the 12 December 2018 home inspection, respondent had been aware of the ongoing safety concerns with his mother's home since 2017. Additionally, Patty presented photographs of some

additional improvements made only *after* the 3 January 2019 hearing, but it was within the trial court's authority to weigh this evidence with the other evidence before the trial court and find that the state of the home in the pictures was "not indicative of the day-to-day condition of the home."

¶ 29    Furthermore, evidence from the hearing indicates that respondent has and continues to live in his mother's home despite earning an income of more than $46,000.00 and maintaining stable employment for ten years yet had not obtained independent housing, despite OCDSS's offers of assistance. Respondent also continues to live with Patty and their other child, but the trial court ceased efforts to reunify Iliana with Patty and Patty did not appeal the 18 August 2020 Court of Appeals decision to this Court. Respondent has no plans of moving out of his mother's home, despite the ongoing safety concerns and overcrowded conditions, nor does he plan to live separately from Patty and their other child. Iliana would be subjected to living with Patty if she were returned to respondent's care, despite the trial court's conclusion that Patty acted inconsistently with her protected status as Iliana's parent. As aptly stated by OCDSS, "[respondent] should not [be] confronted with a Sophie's Choice between Iliana and [Patty] and their new [child]," which would impose further instability in an already precarious situation.

¶ 30    Respondent's housing situation exposes Iliana to unsafe living conditions and exposes her to an unstable living environment. Therefore, we conclude that clear and

convincing evidence supports the trial court's finding that respondent did not have safe and stable housing for Iliana.

**C. Domestic Violence**

¶ 31     Respondent challenges findings of fact 26(c) and 30 as not supported by clear and convincing evidence. We agree with the Court of Appeals that the trial court mischaracterized the incident between respondent and his mother as involving physical violence when there was no evidence to support this characterization. *See In re I.K.*, 848 S.E.2d at 20–21. Therefore, we disregard that portion of finding of fact 30 as not supported by clear and convincing evidence. However, the unchallenged findings of fact documenting respondent's past domestic violence and the domestic incident involving his mother support the trial court's finding that domestic violence was an ongoing concern with respondent.

¶ 32     Specifically, domestic violence between respondent and Patty was identified as an ongoing issue since the first report was made to RCDSS in 2014. In 2016, a domestic violence incident occurred between them that led to respondent being convicted of assault on a female. Subsequently, in May 2017, respondent was ordered by the trial court to participate in a domestic violence perpetrator program in May 2017. While respondent demonstrated a reluctance to participate by missing several sessions, respondent reported that he eventually completed the program in February 2018. Nevertheless, only a few months later, respondent was involved in a domestic

disturbance involving his mother. The involvement of law enforcement was required to address the incident. The 911 call log indicated that respondent was "verbally aggressive towards his mother[ and] was tearing up [his mother's] home that he also resides in" during the 2018 incident.

¶ 33    Considering the unchallenged findings of fact and evidence concerning respondent's history with domestic violence and continued aggressive and violent behavior in the home in August 2018 after completing the domestic violence perpetrator program, we conclude that challenged findings of fact 26(c) and 30 are supported by clear and convincing evidence.

## D. Respondent Acted Inconsistently with his Constitutionally Protected Status as Iliana's Parent

¶ 34    The Supreme Court of the United States has recognized that a natural parent has a constitutionally protected liberty interest in the custody, care, and control of his or her child. *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *see also Petersen v. Rogers*, 337 N.C. 397, 402 (1994) (discussing that "North Carolina's recognition of the paramount right of parents to custody, care, and nurture of their children antedates the constitutional protections set forth in" *Stanley v. Illinois,* 405 U.S. 645 (1972)). In ceasing reunification efforts with a parent and granting guardianship to a nonparent, there is no bright-line test to determine whether a parent's conduct amounts to action inconsistent with his constitutionally protected status. *Boseman*, 364 N.C. at 549. "[E]vidence of a parent's conduct should be viewed cumulatively." *Owenby v. Young*,

357 N.C. 142, 147 (2003).

¶ 35    While there is no bright-line test, respondent's actions displayed an unwillingness to act as Iliana's parent. Reviewed by this Court de novo, the cumulative evidence, as discussed previously herein, supports the trial court's findings that throughout OCDSS's involvement with Iliana, respondent did not refrain from using illegal substances, respondent did not adequately address his issues with domestic violence, and respondent did not obtain safe and stable housing. In fact, in May 2016, respondent voluntarily placed Iliana with her maternal grandmother "until the housing situation was resolved." Yet now, respondent states that he has no plans to move from the unsafe and crowded home, notwithstanding the fact that the home is totally unsuitable for Iliana. What may have begun as a temporary placement is now, by the respondent's choice, an indefinite one.

¶ 36    Since the trial court's findings of fact supporting its conclusion that respondent acted inconsistently with his constitutionally protected status as Iliana's parent were supported by clear and convincing evidence and the findings support the trial court's conclusion, the Court of Appeals did not err by affirming the trial court's order.

## V.    Conclusion

¶ 37    The trial court's challenged findings of fact regarding respondent's substance abuse, lack of safe and stable housing, and domestic violence concerns are supported by clear and convincing evidence, and the findings of fact support the trial court's

conclusion that respondent acted inconsistently with his constitutionally protected status as Iliana's parent. As such, the trial court did not err by concluding that respondent acted inconsistently with his constitutionally protected status as Iliana's parent. Accordingly, we affirm the decision of the Court of Appeals.

AFFIRMED.

Justice EARLS dissenting.

Unless a parent has been deemed unfit, an order awarding guardianship to a nonparent over a parent in the best interest of the child, as occurred in this case, requires the court to find, based on evidence in the record, that the parent has acted inconsistently with his or her constitutionally protected status as a parent. *Price v. Howard*, 346 N.C. 68, 79 (1997). Abdicating its dual responsibilities to follow precedent and uphold the federal constitution, the majority strains to find sufficient facts in this case supporting such a conclusion. If we are not more careful, literally thousands of parents will be swept into the net of potentially losing their parental rights by virtue of their poverty. Such a result is contrary to our constitutional guarantees. As we said in *Price,* "[i]f a natural parent's conduct has not been inconsistent with his or her constitutionally protected status, application of the 'best interest of the child' standard in a custody dispute with a nonparent would offend the Due Process Clause." *Id.* Courts cannot take children away from their natural parents merely because another person could provide a materially better home.

Respondent made the difficult decision on 26 April 2016 to send his daughter (Iliana)[1] to live with her grandmother while he settled his housing situation and received substance abuse treatment. Respondent ultimately completed a substance abuse treatment program in March 2018. The record also reveals one incidence of

---

[1] As does the majority, I use a pseudonym to protect the juvenile's identity and for ease of reading.

domestic violence between respondent and his partner (Patty)[2] for which respondent received treatment, completing a "domestic violence perpetrator program at Alamance County DV Prevention in February 2018." After completing the substance abuse treatment program, the record and the trial court's findings indicate that respondent tested positive for marijuana on one occasion, on 4 September 2018. Moreover, the record and the trial court's findings indicate that, after completing the domestic violence perpetrator program, respondent had a loud argument with his mother that prompted a call to law enforcement.

¶ 40   At the time of the permanency planning hearing, respondent and Patty were living in a two-bedroom mobile home with respondent's mother and respondent's and Patty's infant daughter. They had been living there since being evicted in 2016. That mobile home was deemed to meet minimum standards on two visits in 2017 but was then deemed to be unsuitable on two visits in 2018, the last of which was on 12 December 2018. Between the hearings on 3 January 2019 and 18 January 2019, respondent and Patty improved the condition of the home and provided photographs of the same to the trial court at the 18 January hearing.

¶ 41   The majority has determined that respondent's failure to timely repair the damaged floor of the mobile home or to obtain new housing, along with his positive test for marijuana and loud argument with his mother (the majority describes the

---

[2] As does the majority, I use a pseudonym for Iliana's mother.

argument as "a domestic incident"), sufficiently establish that respondent has acted inconsistently with his constitutionally protected status as a parent. In my view, this low bar is inconsistent with our precedent and seriously threatens the stability of families throughout the state. There is no record evidence that respondent willfully acted to subvert his constitutional rights. Instead, the majority's decision to disrupt his constitutional interest in the upbringing of his daughter poses a threat to families who may be forced by financial constraints to put off home repairs, or who need to place their children with family members when times are hard or while dealing with personal issues. I do not read the record as supporting the conclusion that respondent has acted inconsistently with his constitutionally protected status as a parent, nor do I read the law as permitting such a conclusion where a parent has not acted in conscious disregard of their parental obligations. I respectfully dissent.

## I. Findings of Fact

Respondent has argued in substance that three of the trial court's factual findings are unsupported by the record: (1) that respondent failed to obtain safe and stable housing, (2) that respondent continued to engage in domestic violence after having received treatment, and (3) that respondent continued to have a substance abuse problem after having received treatment. The trial court's findings that respondent "continue[d] to engage in domestic violence and illegal drug use despite [his] completion of treatment and classes" are unsupported by the record. As a result,

these findings cannot support the conclusion that respondent has lost his constitutional rights to his child. Although I might have found differently from the trial court, I agree with the majority that the trial court's conclusion that respondent had "not obtained safe and stable housing appropriate for the juvenile" is supported by the record. In the context of this case, however, that finding is not sufficient to conclude that respondent acted inconsistently with his constitutionally protected status as a parent.

**A. Safe and Stable Housing**

¶ 43    I agree with the majority's determination "that clear and convincing evidence supports the trial court's finding that respondent did not have safe and stable housing for Iliana." The trial court found that, on two occasions in the year leading up to the commencement of the permanency planning hearing, the home in which respondent and Patty were living had been "deemed not suitable for [Iliana]." This finding was supported by testimony from Jordan Houchins, an investigator with Rockingham County Child Protective Services, who stated that he visited the home in spring 2018 and again in December 2018. Mr. Houchins testified that, in addition to problems with the flooring and some clutter, the home was not large enough for another child as well as the home's current occupants, particularly given the "pretty serious health issues" of respondent's mother.

¶ 44    Respondent argues that he "addressed Mr. Houchins' concerns by replacing the

portions of the floor that were unsound and removing items from the home that contributed to the clutter." However, repairing the floors and removing some items from the home does not address the crowded conditions identified by Mr. Houchins. Indeed, the trial court credited the testimony of Mr. Houchins, who testified that "[e]ven if [the mobile home] wasn't cluttered, it's very small" and identified the number of people in the home as a concern. The trial court acted appropriately within its role as factfinder when it determined that the improvements made by respondent were "not indicative of the day-to-day condition of the home" and the improvements were not enough to overcome the conclusions of the most recent report of the CPS investigator and convince the trial court that the home was now safe and appropriate for Iliana.

¶ 45     However, there are plenty of parents and families in our state who experience housing insecurity. Sometimes families are forced to live in cramped conditions. It seems unusually cruel to scrutinize families who are struggling to obtain adequate housing and use the lack of enough bedrooms to justify taking away their children. As discussed in more detail below, the simple fact of living in poor housing conditions is not enough to support the conclusion that a parent has acted inconsistently with their constitutionally protected interest in their child. In the absence of any clear and convincing evidence that respondent had better housing options available and chose this one in contravention of his parental obligations, there is no logical connection

between respondent's housing insecurity and the conclusion that he has acted inconsistently with his constitutionally protected status as a parent. *Cf. Owenby v. Young*, 357 N.C. 142, 147 (2003) (a father's drunk driving was not conduct inconsistent with his constitutionally protected status as a parent because the children were not in the car or living with him at the time). Mere supposition about what the respondent's income might have enabled him to rent is not enough. As a result, while the trial court's finding on this point is supported by the record, that finding does not include the element of volitional conduct that is necessary to support the conclusion that respondent's constitutional interest in his child should be severed.

¶ 46       The majority also mentions the fact that respondent continues to live with Patty and intends to continue doing so. The majority notes that Patty did not appeal the decision below to this Court, leaving intact the trial court's determination that she has engaged in conduct inconsistent with her constitutionally protected status as a parent. This is a particularly unfair and unjustified argument. Patty's conduct is not conduct on the part of respondent that is inconsistent with respondent's obligations as a parent. Moreover, there was never a court order that Patty be kept away from Iliana or other evidence that would make respondent's decision to live with her detrimental to his ability to be a parent.

**B. Domestic Violence**

¶ 47       The trial court's finding that domestic violence continued in respondent's home

was unsupported. Instead, the evidence in the record at most supports the conclusion that respondent engaged in a loud argument with his mother.

¶ 48     In support of its conclusion that respondent had "acted inconsistently with [his] constitutionally-protected right to parent" Iliana, the trial court found that respondent "continue[d] to engage in domestic violence." The trial court elaborated, finding that respondent "completed a domestic violence perpetrator program at Alamance County DV Prevention in February 2018." The trial court also noted that "[t]here has not been another identified domestic violence incident between [respondent and Patty]." The trial court, however, stated that "there has been domestic violence in the home between [respondent] and his mother." This finding was unsupported.

¶ 49     The trial court wrote that "law enforcement responded to a domestic disturbance involving [respondent] and paternal grandmother" and that respondent "testified he and [his mother] had a disagreement over his misplacing her handicapped placard. He stated that he fell into the dryer while [his mother] was in the bathroom, and then he left the home." The record indicates that respondent's mother "reported it had been a 'family disagreement.' " There is no evidence in the record that respondent was violent toward his mother, that respondent was violent toward his mother's property, or that there was any law enforcement involvement related to the incident other than responding to a call about a disturbance. The record

does not support the majority's factual finding that respondent engaged in "aggressive and violent behavior," nor does the record support the trial court's factual finding that respondent "continue[d] to engage in domestic violence."

**C. Drug Use**

The trial court's findings that respondent "continue[d] to engage in illegal drug use" and that "the issue[ ] of substance use" was "still present despite numerous services that have been offered" are similarly unsupported. As the trial court acknowledged, the only evidence that respondent continued to use illegal drugs after receiving substance abuse treatment was one positive drug screen for marijuana on 4 September 2018. However, this drug screen was followed by three negative drug screens in the months leading up to the permanency planning hearing. Moreover, this was the only positive drug screen from May 2016 through December 2018.

The majority characterizes respondent's request that we conclude the trial court's findings were not supported by the record as a request to "reweigh the evidence." However, this characterization is off the mark. It is, of course, our job on appellate review to look to the record and determine whether the trial court's findings are supported by the evidence. In this case, a review of the relevant record evidence reveals no record that respondent had a problem with substance abuse, or even that respondent used illegal drugs on more than one occasion in over two years.

The majority leans heavily on the fact that "throughout the duration of this

case," respondent refused eleven out of thirty-one requests for drug screens. What the majority overlooks is that from November 2016 through December 2018, respondent was in fact tested (meaning that he did not refuse the test) at least one time each month and received a negative test result. The only exceptions are a positive test in January 2017 for oxycodone, for which respondent provided a prescription, and the one positive test for marijuana in September 2018. Against this backdrop, in which it is clear from the record that respondent tested negative for drugs each month for more than two years and had just one positive drug test for a nonprescription drug in that time, it is astoundingly disingenuous for the majority to conclude that the record supports the trial court's finding that respondent continued to engage in illegal drug use despite the completion of substance abuse treatment. Even more disingenuous is the majority's reliance on the fact that "Patty exchanged text messages with respondent that displayed drug-seeking behavior." The majority neglects to mention the trial court's finding that the text messages evidenced drug-seeking behavior on the part of *Patty*, not on the part of respondent.

## II. Legal Conclusions

¶ 53        The trial court's remaining factual findings establish that respondent failed to secure adequate housing despite seemingly making enough money to afford better housing or to improve the existing housing. This finding is not sufficient to support the conclusion that respondent acted inconsistently with his constitutionally

protected status as a parent. "North Carolina law traditionally has protected the interests of natural parents in the companionship, custody, care, and control of their children, with similar recognition that some facts and circumstances, typically those created by the parent, may warrant abrogation of those interests." *Price*, 346 N.C. at 75. For example, the interest may be overcome "when a parent neglects the welfare and interest of his child." *Id.* (quoting *In re Hughes*, 254 N.C. 434, 437 (1961)).

¶ 54        As explained in more detail below, a conclusion that this interest has been overcome requires factual findings that a parent has willfully acted contrary to their parental obligations. Without evidence that respondent chose to live in substandard conditions in contravention of his obligations to Iliana, the findings related to respondent's housing are insufficient to support the necessary legal conclusion.

¶ 55        The majority fails to discuss any of our relevant precedent and summarily concludes that: "[w]hile there is no bright-line test, respondent's actions displayed an unwillingness to act as Iliana's parent." *But see Price*, 346 N.C. at 75 ("[P]rior cases of this Court are instructive on the issue [of whether a parent's constitutionally protected interest must prevail] because they show how we have addressed custody issues in a wide variety of circumstances."). A review of our prior cases demonstrates that respondent's actions in this case do not rise to the level of conduct that we have previously found to be inconsistent with the constitutionally protected status as parent.

¶ 56        In an early case on the issue before us here, we considered a custody dispute between a biological mother and a non-biological father. *Price*, 346 N.C. at 70–71. From the time that the child was born, the mother had represented that the man she lived with at the time was the child's biological father. *Id.* at 71. However, the parents separated just a few years after the child's birth. *Id.* The child lived primarily with the purported father, although she also spent some time with her mother. *Id.* Approximately three years after the separation, the purported father sued for custody when the mother attempted to have the child's school records transferred to another county's school system. *Id.*

¶ 57        We concluded that the record was not sufficient to determine whether the mother had acted inconsistently with her constitutional right to parent. *Id.* at 84. The trial court had "made no findings about whether defendant and plaintiff agreed that the surrender of custody would be temporary, or about the degree of custodial, personal, and financial contact defendant maintained with the child after the parties separated." *Id.* If the mother had "represented that plaintiff was the child's natural father and voluntarily given him custody of the child for an indefinite period of time with no notice that such relinquishment of custody would be temporary," we would have held that the mother had acted inconsistently with her constitutional right to parent. *Id.* at 83. This is because, in that case, the mother "would have not only created the family unit that plaintiff and the child [had] established, but also induced

them to allow that family unit to flourish in a relationship of love and duty with no expectations that it would be terminated." *Id.*

¶ 58        In another case, we considered a custody dispute between a child's biological mother, biological father, and maternal grandparents. *Adams v. Tessener*, 354 N.C. 57, 58 (2001). The mother and father had a one-night stand that eventually resulted in the child's birth. *Id.* at 63–64. The mother informed the father that she was pregnant, but the father "took no action at that time." *Id.* at 58. Approximately four months after the child was born, the mother again contacted the father and told him that he would be contacted by the Department of Social Services regarding child support. *Id.* at 59. The father "made no inquiry concerning [the child]." *Id.* However, the father signed a voluntary support agreement and began making child support payments after DSS conducted a DNA test and determined that he was the father. *Id.* Some months later, after completing three visits with the child, the father sought to intervene in an existing custody action between the mother and maternal grandparents and sought custody of the child. *Id.* We concluded that the father's conduct had been inconsistent with his constitutionally protected interest in the child. *Id.* at 66. We noted that the father had "elected to do 'nothing' about the pregnancy and impending birth" upon being informed about the pregnancy. *Id.* We also considered that the father had made no inquiries with the child's mother about the child's "health and progress" nor had he made any further inquiry as to "whether

he had fathered the child." *Id.* We concluded that this failure to involve himself in the child's life supported the trial court's conclusion that the father had acted inconsistently with his rights to the child. *Id.*

¶ 59    We have also held that a mother's "lifestyle and romantic involvements," including her employment as a topless dancer, resulting in her "neglect and separation from the child" amounted to conduct inconsistent with the right to parent. *Speagle v. Seitz*, 354 N.C. 525, 528, 534 (2001). The evidence in that case further indicated that the mother had conspired with a boyfriend to kill the child's father, even though she was acquitted of criminal charges. *Speagle,* 354 N.C. at 532–33; *see also Owenby*, 357 N.C. at 147 (discussing *Speagle*).

¶ 60    In *Owenby v. Young*, however, we affirmed a trial court's conclusion that a parent's "protected status as parent was not constitutionally displaced." 357 N.C. at 148. The parent in that case, the father of two children, had divorced the children's mother seven years before the mother's death in a plane crash. *Id.* at 142. Prior to her death, the mother had primary custody while the father had "secondary custody, structured as visitation." *Id.* The children's maternal grandmother sought custody of the children, arguing that their father had problems with alcohol abuse, was financially unstable, and sometimes drove without a license. *Id.* at 143. The Court of Appeals opinion contains additional information about the evidence presented to the trial court:

A two-day hearing was held on 7 and 18 December 2000 to determine if Plaintiff had standing to seek custody of Trey and Taylor. The trial court stated Plaintiff's burden was "to show [Defendant] to be unfit or in some other way to have acted . . . in a [manner] inconsistent with the parental relationships." At the hearing, Defendant testified he has driven while impaired and has also driven without a license. At times, Defendant has "operated a vehicle[ ] and consumed alcohol at the same time." Defendant also testified that while he knew it was wrong, he has allowed others to drive his children in the recent past while the individuals were consuming alcohol. According to Defendant, the children have spent a significant part of their lives in McDowell County, living either with or in proximity to Plaintiff.

Both Trey and Taylor testified they often smelled alcohol on Defendant's breath. Trey stated that on several instances in the past, he has ridden in a vehicle with Defendant while Defendant drank beer. In addition, Trey's paternal uncle, while drinking, has driven Trey, Taylor, and Defendant to Charlotte.

Taylor testified that on more than one occasion, he has ridden in a car with Defendant while Defendant and others consumed alcohol while driving. On one occasion, when the children's paternal uncle was drinking alcohol and driving, the children were involved in an automobile accident but were not severely injured. Taylor stated that he did not feel good about riding with his father because he was "afraid [Defendant] might . . . [drink] and [they] would get in a wreck again." Both children testified that when Defendant drinks alcohol, he becomes upset and agitated with Trey and Taylor. The two minor children were aware Defendant's driver's license was suspended, he often operated a vehicle while drinking alcohol or being under its influence, and Defendant operated a vehicle on several occasions while his license had been revoked.

*Owenby v. Young*, 150 N.C. App. 412, 413–14 (2002) (alterations in original).

¶ 61     The trial court determined that the father had a consistent employment history and improved finances, that most instances of his driving without a license were not on public roads, and that the father did not have a problem with alcohol abuse (going so far as to conclude that two convictions for driving while impaired did not raise an inference of "a problem with alcohol abuse"). *Owenby*, 357 N.C. at 143–44. This Court agreed, noting that it was of significance that the father "did not have primary custody of the children, nor were they accompanying him, on either of the occasions for which he received a driving while impaired citation." *Id.* at 147. We concluded that the child's maternal grandmother "failed to carry her burden of demonstrating that defendant forfeited his protected status" and reversed the Court of Appeals, reinstating the trial court's order. *Id.* at 148.

¶ 62     Our decisions in *Price*, *Adams*, and *Speagle* all involved a consistent defining feature: volitional conduct on the part of the parent intended in contravention of their parental obligations. For example, the mother in *Price* actively represented that the child's purported father was the biological father and voluntarily relinquished custody to the purported father. *Price*, 346 N.C. at 83. We determined that this conduct would be inconsistent with the constitutionally protected parent status if the mother had not made clear that the arrangement was temporary, because it would have actively "induced [father and child] to allow that family unit to flourish" without her. *Id.* Similarly, in *Adams*, the father ignored the existence of his child despite

repeated contact from the child's mother. *Adams*, 354 N.C. at 58–59. When we determined that the father's conduct was inconsistent with his constitutionally protected parent status, we did not focus our determination merely on the father's absence—instead, we discussed the father's decision to be absent from his child's life. *Id.* at 66. Finally, in *Speagle*, the Court held that evidence that a mother had some involvement in a conspiracy to murder her child's father was relevant and if proven by a preponderance of the evidence, such conduct would be inconsistent with her constitutionally protected status as a parent. *Speagle,* 354 N.C. at 532–34. In each case, the parent engaged in willful conduct evidencing an intention to act inconsistently with their obligations as a parent.

¶ 63     In the instant case, no such willful conduct exists. The only evidence of drug use by respondent following treatment is a single positive test for marijuana in over two years of consistent testing. Similarly, the only evidence of domestic violence is a loud argument with respondent's mother. Neither of these isolated incidents supports the conclusion that respondent acted willfully in contravention of his parental obligations.

¶ 64     This leaves the trial court's findings that respondent lived in housing conditions that were not appropriate for Iliana to reside in. While, as discussed above, I agree that the trial court's findings are supported by the evidence, this does not indicate that respondent acted contrary to his parental obligations. As the trial court

noted, respondent improved the condition of the home between the hearing's commencement on 3 January 2019 and the hearing's second day on 18 January 2019. At the same time, there is no evidence in the record that respondent had better housing options available—instead, the trial court found that respondent and Patty had been living with respondent's mother since being evicted in 2016. In the absence of any evidence that respondent had better options available, it cannot be said that respondent's living conditions are "conduct" on his part that is inconsistent with his constitutionally protected status as a parent. Indeed, the evidence that respondent improved (albeit not sufficiently) the conditions of the home prior to the hearing on 18 January 2019 suggest that he was attempting to live up to his obligations as a parent. As a result, applying the rule that is apparent from our decisions in similar cases, it is inappropriate to conclude that respondent has forfeited his constitutional interest in Iliana. The majority's characterization of respondent's living situation as a choice resulting in Iliana's indefinite absence from the home does nothing to create the missing factual findings which are necessary to show that respondent, with other options available to him, actually chose to live in housing that would not and could not support his daughter.[3]

---

[3] Ironically, the majority writes that respondent should not be confronted with the "Sophie's Choice" of choosing between living with Iliana on the one hand and living with Patty and his new child on the other. In fact, it is only the majority's decision here that would have forced him to do so.

¶ 65        A more direct application of and comparison to the decisions in the cases cited above suggests that respondent's conduct was consistent with his constitutionally protected status as a parent. As in *Price*, this case "involves a period of voluntary nonparent custody rather than unfitness or neglect." *Price*, 346 N.C. at 82. However, unlike *Price*, there is no indication in the record that respondent "represented to [Iliana] and to others that [her maternal grandmother] was [Iliana's] natural [mother]." *Id.* at 83. Moreover, the circumstances of the relinquishment made clear from the outset that it was to be temporary—respondent placed Iliana in the care of her maternal grandmother because of respondent's work schedule and because of respondent's lack of adequate housing and agreed it would last "until the housing situation was resolved and [respondent and Patty] engaged in substance abuse treatment." Whereas we determined that "relinquishment of custody" to a nonparent "for an indefinite period" would be conduct inconsistent with the constitutional right to parent in *Price* because such conduct would have "created the family unit that [the nonparent] and the child have established" and "also induced them to allow that family unit to flourish in a relationship of love and duty with no expectations that it would be terminated," *Price*, 346 N.C. at 83, no such concerns are present here. The present case presents precisely the scenario we envisioned in *Price*, where a parent's decision to temporarily send a child elsewhere could be action *consistent* with their obligations as a parent and therefore consistent with their constitutionally protected

status as a parent. *See id.* ("We wish to emphasize this point because we recognize that there are circumstances where the responsibility of a parent to act in the best interest of his or her child would require a temporary relinquishment of custody, such as under a foster-parent agreement or during a period of service in the military, a period of poor health, or a search for employment.").

The father in *Adams* showed almost no interest in the existence of his child, and his absence from the child's life was a result of his failure to involve himself despite repeated contact from the mother. *Adams*, 354 N.C. at 58–59. By contrast, there is no evidence in the present case that respondent abandoned Iliana. Rather, respondent's decision to place Iliana with a nonparent custodian appears to have been an act of parental responsibility, as the trial court found that the placement was made voluntarily in acknowledgment that respondent needed to improve Iliana's home life. Similarly, respondent has not shown the type of conduct inconsistent with parental status as was demonstrated in *Speagle*—no evidence in the record indicates that respondent was involved in murdering Iliana's mother or indeed that respondent engaged in any other seriously illegal conduct even potentially injurious to his ability to parent Iliana.

Respondent's conduct in this case does not arise nearly to the level of conduct which we have previously found to forfeit a parent's constitutional interest in their child. Instead, the record evidence shows that respondent has responded well to

treatment for substance abuse and domestic violence but remains in a difficult housing situation. I do not believe that the law permits a difficult housing situation, without evidence that it results from a parent's decision in contravention of that parent's obligations to a child, to sever the constitutionally protected tie between parent and child. I respectfully dissent from the majority's decision.